# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAURA C. NOAH,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:11-CV-4099-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **COMMISSIONER OF** | } | |
| **SOCIAL SECURITY,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Laura C. Noah brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act") seeking review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Social Security Disability Insurance Benefits and Supplemental Security Income.  (Doc. #1 at 1); *see* 42 U.S.C. §§ 405(g) and 1383(c).  Based upon the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I. Proceedings Below

This action arises from Plaintiff's applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), filed November 18, 2008, alleging disability beginning on December 22, 2005,[1] four days before she stopped working as a waitress at a Waffle House.  (Tr. 131, 40).  Both claims were denied on January 7, 2009.  (Tr. 79).  Plaintiff then requested and received a hearing before Administrative Law Judge Jill Lolley Vincent on August 12, 2010 in Birmingham, Alabama.  (Tr. 34).  In her decision, dated

---

[1] This is Plaintiff's third application alleging disability beginning on December 22, 2005.  (Tr. 39).  The alleged onset state was later amended to July 4, 2008 (Tr. 73-74); however, Plaintiff requested that the earlier onset date be reconsidered at the hearing (Tr. 39).

December 8, 2010, the administrative law judge ("ALJ") determined that Plaintiff had not been under a disability within the meaning of the Act. (Tr. 22). Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on October 4, 2011. (Tr. 1). Because the denial of review by the Appeals Council constitutes the final act of the Commissioner, this case is now ripe for this court's review. 42 U.S.C. §§ 405(g) and 1383(c)(3).

Plaintiff was born on June 17, 1981 and was 27 years old when she filed her Social Security applications. (Tr. 131, 135). She had completed the tenth grade before dropping out of high school. (Tr. 40). Prior to her alleged onset date of disability, Plaintiff had worked as a sandwich maker at a Subway restaurant, an assistant manager in food services, a call packager with Kellogg's, a store cashier, a store laborer, and as an administrative clerk. (Tr. 61-62). Her last job was as a head waitress at a Waffle House. (Tr. 40, 62-63). Plaintiff left that job on December 26, 2005, allegedly due to back pain. (Tr. 40, 162). When the ALJ at the hearing asked Plaintiff to identify the medications she was currently taking for her back pain, Plaintiff testified that she was not taking any medication at the time "because [Plaintiff] cannot afford to go to a doctor." (Tr. 43). However, between the alleged onset date of disability and the hearing before the ALJ, Plaintiff saw quite a few doctors. While it is lengthy, a brief recitation of Plaintiff's medical history is invaluable to understanding Plaintiff's claims in context, as well as evaluating the ALJ's credibility determinations.

The earliest medical records provided by Plaintiff are examinations from January 11, 2006 by Dr. Carl Billian at the Coosa Medical Group in Rome, Georgia. (Tr. 245). In his report following his first examination of Plaintiff, Dr. Billian recorded the account given by Plaintiff and her mother of the injury that caused Plaintiff's back pain. (*Id.*). During that exam, Plaintiff

told Dr. Billian that, on December 22, 2005, she "walked into a freezer at the Waffle House and began to pick up three cases of sausage." (*Id.*). These cases "were not significantly heavy," but as Plaintiff squatted down to pick the cases up, she immediately experienced back pain. (*Id.*). Plaintiff indicated to Dr. Billian that she sought workers compensation and was represented by an attorney.

Suspecting possible L5-S1 radiculopathy, Dr. Billian had Plaintiff undergo a lumbar spine MRI on January 19, 2006. (Tr. 238). The MRI examination revealed Plaintiff's lumbar spine to be completely normal. (Tr. 233). During the follow up examination the next day, Plaintiff told Dr. Billian that the pain had spread into her mid-back, neck, and left leg. (Tr. 244). Plaintiff also admitted that she did not attend physical therapy as previously instructed because she was unaware that it was listed in her prescription; Dr. Billian rewrote Plaintiff's prescription and explained to Plaintiff that she needed to have physical therapy with lumbar traction. (*Id.*). Plaintiff assured Dr. Billian that she understood and requested more medication for pain. (*Id.*). Dr. Billian decided instead to reduce Plaintiff's pain medication down to Vicoprofen. (*Id.*).

At the same time that Plaintiff saw Dr. Billian for back pain, she also visited the gynecology department at the Harbin Clinic in Rome, Georgia on February 27, 2006 complaining of severe menstrual pain. (Tr. 559). Her physician, Dr. Douglas Lawrence, ordered transabdominal and transvaginal ultrasounds, which were conducted on February 22, 2006 by Dr. Allan Stephenson. (Tr. 564-65). The ultrasounds found multiple cysts in the ovaries, but otherwise revealed a normal uterus. (Tr. 565). On March 3, 2006, Dr. Lawrence conducted a laparoscopic examination of Plaintiff's ovaries and a hysteroscopic examination of Plaintiff's uterine cavity. (Tr. 568-69). The laparoscopy revealed widespread endometriosis on the

surfaces of Plaintiff's ovaries, while the hysteroscopic exam found the uterine cavity smooth, symmetrical, and free of lesions or polyps.  (*Id.*).  With regard to medication, Dr. Lawrence's notes list only Celebrex among Plaintiff's prescriptions at the time of the February examinations. (Tr. 559).  Ultrasounds were conducted again six months later by Dr. Joseph J. Burch, who found that the ovarian cysts had disappeared and that the ultrasounds were unremarkable.  (Tr. 562-63).  By this point, Dr. Lawrence noted that Plaintiff's prescription medications included Celebrex, Hydrocodone-Acetaminophen (Lortab), Lupron Depot, Medroxyl Progesterone Acetate, Ortho-Novum, and Naproxen Sodium.  (Tr. 538).

Plaintiff returned to Dr. Billian for a follow up appointment on March 23, 2006.  (Tr. 243).   During that appointment, Plaintiff mentioned her laparoscopic procedure with Dr. Lawrence and told Dr. Billian that she was prescribed a hormone injection for her endometriosis, but could not afford it because she was not covered by insurance.  (*Id.*).  Similarly, Plaintiff reported that she was unable to afford the physical therapy that Dr. Billian prescribed.  (*Id.*).  In the meantime, Plaintiff's back pain, she alleged, continued unabated and had spread down her thigh to her knee.  (*Id.*).  Dr. Billian conducted a neurologic examination that failed to detect any problems.  (*Id.*).  Unwilling to continue prescribing narcotic medications, Dr. Billian started Plaintiff on Neurontin for her pain.  (*Id.*).

When Dr. Billian next examined Plaintiff on May 4, 2006, she told him that the Neurontin helped "a lot," but that she was unable to refill her prescription due to financial limitations.  (Tr. 242).  Plaintiff's mother also attended the session and informed Dr. Billian that Plaintiff's worker's compensation claim had been denied and that Plaintiff was still represented by an attorney.  (*Id.*).

During the next check up, conducted on July 6, 2006, Plaintiff indicated that she stopped taking the Neurontin altogether and her symptoms worsened significantly as a result. (Tr. 241). Plaintiff complained of tingling in her legs, arms, and hands. (*Id.*). Dr. Billian found it difficult to elicit a more specific description of this symptom, so he scheduled a nerve conduction study and an electromyography to help uncover the source of the problem. (*Id.*). The tests, conducted on July 31, 2006, revealed normal functioning. (Tr. 238-39). Dr. Billian notes in his report on the tests that Plaintiff's symptoms had changed; although she initially complained of lower back pain and later said that the pain had migrated to her leg, she indicated during the tests that her pain was more severe in her left arm. (Tr. 238). Dr. Billian then conducted an electromyograph of Plaintiff's left arm, which revealed normal functioning. (Tr. 239). Plaintiff also complained of pain in her left hand, particularly in the joints and knuckles, which she had sought to relieve by taking a family member's Lorcet tablet. (Tr. 238). Dr. Billian concluded that Plaintiff has carpal tunnel syndrome. (Tr. 239). When asked whether he would keep her off work, Dr. Billian wrote an unrestricted release allowing Plaintiff to return to work without restrictions. (*Id.*).

Dr. Billian saw Plaintiff again on November 1, 2006. (Tr. 237). By this point, Dr. Billian noted that Plaintiff has "a tendency to serially develop new symptoms." (*Id.*). During this visit, Plaintiff "again, beg[an] relating other symptoms/injuries." (*Id.*). Plaintiff told Dr. Billian that "she smashed her foot by having a heavy speaker fall on it, that it is badly injured, but she has had x-rays that were negative and she is going to see a specialist." (*Id.*). Dr. Billian's report also mentions a functional capacity exam, dated September 21, 2006, that found Plaintiff capable of engaging in sedentary to light physical activities with significant limitations

on dynamic lifts due to Plaintiff's lower back pain. (*Id.*). The report also noted that Plaintiff "demonstrated gross outward displays of emotional distress, crying and sobbing" and twice requested that the residual capacity examination be stopped. (*Id.*). The examiner noted that Plaintiff cried throughout the exam, which he had never seen a patient do before. (*Id.*).

On January 3, 2007, Plaintiff began seeing Dr. Richard Donadio for ongoing pain in her lower back and leg, and for the pain in her right foot following the incident with the speaker. (Tr. 329). Dr. Donadio noted that Plaintiff's right foot was being treated by Dr. Lapointe, whose files are not present in the record. (*Id.*). Dr. Donadio thought Plaintiff's symptoms suggested radiculopathy and scheduled an epidural steroid injection, which was administered on January 22, 2007. (Tr. 327-29).

Plaintiff complained to Dr. Billian during their subsequent meeting on February 22, 2007 that she thought the epidural steroid injection ordered by Dr. Donadio made her condition worse. (Tr. 235).[2] This visit was apparently the first time Plaintiff informed Dr. Billian that she had seen Dr. Donadio and was the last documented session between Plaintiff and Dr. Billian. (*Id.*).

Dr. Donadio ordered Plaintiff to undergo a whole body bone scan, which was conducted by Dr. Anthony D. Warden on February 22, 2007. (Tr. 324-25). The scan found some evidence suggesting possible mild degenerative changes in her metatarsophalangeal joints (more in her left foot than in her right foot), but showed otherwise normal bone structure and functioning. (Tr. 325). On March 26 2007, Dr. Donadio informed Plaintiff that he could no longer provide medical care for her and suggested that she find herself anther physician without delay. (Tr. 318).

---

[2] Dr. Billian noted, however, that Plaintiff would not specify how the epidural made her worse off. (Tr. 235).

On July 17, 2007, Plaintiff began consulting Dr. Michael Heim at the Harbin Clinic to treat her pain.  (Tr. 343, 530).  Plaintiff told Dr. Heim that she became disabled due to a car accident that fractured her pelvis and injured her sciatic nerve.[3]  (*Id.*).  Plaintiff also reported that she had begun suffering panic attacks over the course of the year since the accident.[4]  (*Id.*).  Dr. Heim noted that Plaintiff has no prior history of anxiety or depression.  (*Id.*).  Plaintiff further complained of pain in her chest wall, left thoracic and lumbar spine, and in her lower extremities, which Dr. Heim indicated had been explored by previous medical tests, all of which found normal functioning.  (*Id.*).  Plaintiff averred that she was not taking any pain medications and that it had been a long time since she last attended pain management; however, Dr. Heim found that Plaintiff had been prescribed Klonopin by another doctor and seen by pain management for the past three years.  (Tr. 343, 530).  To combat the pain, Dr. Heim provided Plaintiff with prescriptions for Toradol, Klonopin, and paroxetine hydrochloride (Paxil).  (Tr. 344).

Dr. Heim checked up with Plaintiff the following week for signs of improvement.  (Tr. 341).  Plaintiff indicated that she stopped taking the Paxil because she read on the internet that Paxil would decrease her libido, among other symptoms.  (*Id.*).  Plaintiff also reported that her pain had not improved since her previous visit.  (*Id.*).  Dr. Heim ordered an MRI to be conducted the next day (Tr. 341), but the results of the MRI appear to have gotten lost in the medical records (*see* Tr. 339).  By the time Dr. Heim saw Plaintiff again on September 4, 2007, Plaintiff

---

[3] No evidence confirming either the car accident or the injuries to Plaintiff's pelvis has been included in the record.

[4] None of Plaintiff's treating physicians during the year before this visit recorded any mention by Plaintiff of panic attacks or even a car accident.

had stopped seeing pain management because she was told that there was nothing they could do for her.  (Tr. 339).  Plaintiff reported that she was still struggling with anxiety issues.  (*Id.*).

During the Winter of 2007, Plaintiff received intensive medical care for complications arising from pneumonia.  While visiting Dr. Heim on November 16, Plaintiff complained of coughing and a sore throat, and noted that her Prozac was not helping much.  (Tr. 337).  Two days later, Plaintiff was admitted to the emergency room at Cherokee Medical Center for dyspnea (shortness of breath).  (Tr. 285).  Plaintiff was transferred to the Redmond Regional Medical Center and placed under the care of Dr. Bruce Suckling, who concluded that Plaintiff's respiratory failure was precipitated by pneumonia.  (Tr. 286).  Plaintiff had been suffering from fevers and coughs and had, physicians noted, apparently received some anti-microbial therapy as an outpatient, but could not identify which antibiotic she received.  (*Id.*).  Dr. Suckling also noted that Plaintiff had a "[q]uestionable history of substance abuse" and medical records from this visit indicate that Plaintiff had used tobacco products and that her blood alcohol level was elevated when she was admitted to the emergency room.  (Tr. 285-86).  Plaintiff was intubated, placed on a ventilator, and sedated.  (Tr. 285).  Plaintiff's condition remained stable until she pulled out her breathing tube the next day, which resulted in her lungs failing to properly oxygenate or inflate.  (Tr. 283).  Doctors reinserted the tube and Plaintiff was frequently monitored over the next few days by multiple doctors, who noted substantial improvements following the re-intubation.  (*Id.*; *see* Tr. 305-317, 489).  By November 24, 2007, Plaintiff's doctors determined that she had recovered from her illness and discharged her home.  (Tr. 283).  A chest X-Ray on December 18, 2007 confirmed that Plaintiff's lungs had cleared.  (Tr. 518).

8

Shortly after undergoing a ureteral stone extraction on January 7, 2008 (Tr. 333, 321), Plaintiff returned to Dr. Heim on January 22, 2008 with continued complaints regarding panic disorder, anxiety, and back pain as well as new complaints of asthma and a sore throat with congestion. (Tr. 331). This is the last recorded visit between Plaintiff and Dr. Heim; Plaintiff's visits to the Harbin Clinic over the subsequent three months were conducted with Dr. Shalini Reddy, whose notes reflect Plaintiff's unchanged complaints of anxiety/panic disorder and pain as well as concern for Plaintiff's inability to follow prescribed treatments due to financial restrictions. (Tr. 346, 550-52). Apparently concerned about Plaintiff's history of polysubstance abuse, Dr. Reddy reduced the dosage of Klonopin in Plaintiff's prescription and ordered a urine drug screen conducted. (Tr. 550). Plaintiff eventually decided to stop seeing Dr. Reddy, claiming that the doctor was not helping her but hurting her. (Tr. 413).

Plaintiff was examined by Dr. Sean Stehr, a consultative examiner, on May 31, 2008 as part of her application for Social Security benefits. (Tr. 377). Plaintiff told Dr. Stehr that she had recently been diagnosed with fibromyalgia[5] and complained of lower back pain. (*Id.*). Plaintiff denied using illicit drugs.[6] (Tr. 378). Plaintiff also denied having any surgeries or epidurals for her lower back pain.[7] (Tr. 377). Dr. Stehr noted that, while Plaintiff complained of substantial pain in her lower back, legs, and abdomen (from her endometriosis), she also said that her pain was relieved with rest and pain medications. (*Id.*). Dr Stehr commented that he found Plaintiff's pain behaviors to be out of proportion to the exam. (Tr. 380). Based on her

---

[5] This is inconsistent with the findings of Plaintiff's treating physicians in the record.

[6] During a drug screen conducted nine days before Dr. Stehr's examination, Plaintiff tested positive for opiates and benzodiazepines and had a blood alcohol level of 38. (Tr. 356). Although the court does not understand what "quantity" that figure indicates, it does understand that Plaintiff had alcohol in her system at the time of the examination.

[7] Plaintiff actually did have an epidural for her lower back pain. (Tr. 327).

9

statements, Dr. Stehr found that Plaintiff is "100% independent" with regard to "all activities of daily living, including ambulation and transfers" as well as "light housework such as cleaning, dishes, cooking, and laundry as long as she takes frequent breaks." (Tr. 378). Plaintiff also told Dr. Stehr that her severe anxiety and depression led to multiple suicide attempts in the past. (Tr. 377). Dr. Stehr did not make any findings regarding Plaintiff's anxiety or depression, indicating instead that he would defer to the opinion of a mental health expert on that issue. (Tr. 380).

On July 13, 2008, Plaintiff was admitted to the Redmond Medical Center emergency room for an injury to her left knee that was sustained when a family member backed her car into Plaintiff. (Tr. 549). Plaintiff recalled that the car "rode up" onto her "like the wheel went up over her." (*Id.*). Dr. John McCord, the physician who treated Plaintiff for this injury, was less than convinced that Plaintiff was actually crushed by the car; multiple x-rays of Plaintiff's left knee revealed no fractures. (*Id.*).

Plaintiff began seeing mental health experts in May 2008. On May 28, 2008, as part of the Social Security administrative process, Plaintiff received an examination from Dr. Jack L. Bentley, Jr. (Tr. 372). During this examination, Plaintiff attributed the onset of her psychological difficulties to being molested by her uncle when she was 6 years old. (*Id.*). Plaintiff indicated to Dr. Bentley that she had been consulting mental health experts at the Cherokee Etowah Dekalb Mental Health Center ("C.E.D.") over the past few months.[8] (*Id.*). She also told Dr. Bentley that she had been treated with Paxil[9] by her family physician, Dr. Herrera. (*Id.*). Dr. Bentley noted that the use of medication has resulted in less frequent panic

_____

[8] The earliest record of correspondence between Plaintiff and C.E.D. is dated May 23, 2008, less than a week before Plaintiff met with Dr. Bentley. (Tr. 413). According to Ms. Clark, Plaintiff's first date of treatment at C.E.D. was on May 27, 2008, which was the day before Plaintiff was examined by Dr. Bentley. (Tr. 598).

[9] Paxil is the same drug that Plaintiff said she had stopped taking out of fear for the side effects. (Tr. 341).

attacks and reduced Plaintiff's anxiety to the point where, according to Plaintiff, she was able to control her anxiety reasonably well unless she is in a large crowd.  (*Id.*).  Dr. Bentley also credited Plaintiff's statements that she had cut her wrists on two occasions and that her last suicide attempt landed Plaintiff in the Floyd Medical Center and the Northwest Regional Hospital in Floyd County a week before the examination.[10]  (Tr. 372-73).  Based on this information, Dr. Bentley diagnosed Plaintiff with PTSD.  (Tr. 374).

On May 23, 2008, Plaintiff began attending weekly therapy sessions with Ms. Mary Clark, a therapist at the C.E.D..  (Tr. 341).  The handwritten reports from these sessions indicate that most of them ended with verbal and emotional "[s]upport given" to Plaintiff by Ms. Clark and include recollections of topics discussed during therapy sessions.  (*See* 384-413, 580-88, 590-99, 625-59).

Dr. Richard Grant, a psychiatrist at C.E.D., performed an evaluation on Plaintiff on June 13, 2008.  (Tr. 395-97).  However Dr. Grant's relationship to Plaintiff is hard to discern from the record.  Aside from his rather illegible[11] evaluation, several other documents bear his signature.  (Tr. 485, 571-78, 606, 616-21, 624, 648, 650).  Three of those documents do not appear to have been written by him.  For example, an undated letter bearing his signature states that "[Plaintiff] has been determined totally disabled by Dr. Grant."  (Tr. 485).  Another document was completed by a therapist at C.E.D.; Dr. Grant merely signed that he concurred with the diagnosis two weeks after it was given.  (Tr. 621).  A psychiatric/psychological impairment questionnaire,

---

[10] Records from Northwest Georgia Regional Hospital do indicate that Plaintiff was admitted a week before her examination with Dr. Bentley for cutting herself, but Plaintiff's own account of the event does not suggest that it was a suicide attempt.  (Tr. 357) ("I got really depressed and cut myself, no[t] deep enough to [require] stitches.").  No mention is made of Plaintiff cutting herself in the records from the Floyd Medical Center.  (*See* Tr. 414-28).

[11] Admittedly, this is an understatement.

11

though signed by Dr. Grant, is written in Ms. Clark's handwriting and reflects facts recorded by Ms. Clark. (Tr. 571-78). The only documents that appear to have been completely entirely by Dr. Grant are several single-paged forms: one form letter in which the signer checks off the statement that best represents the degree to which a patient's disability may be attributed to that patient's drug and/or alcohol use (Tr. 606) and several single-paged, nearly-identical progress report forms in which the signer checks off symptoms observed in the patient (*see e.g.* Tr. 387, 624, 637, 642, 644, 648, 650).[12]

## II.  ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled.  20 C.F.R.  § 404.1520(a)(4)(iii).

---

[12] Some of these citations are to duplicate documents.

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  When determining a claimant's RFC, an ALJ considers all relevant evidence of impairment, including subjective claims of pain.  If a claimant alleges disabling pain, the ALJ must properly apply the Eleventh Circuit's pain standard when evaluating a claimants subjective allegations of pain.

In the fourth step, the ALJ determines whether the claimant's RFC allows the claimant to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).  When seeking to determine whether jobs exist that the claimant can perform given her RFC, the ALJ may elicit testimony from a vocational expert (a "V.E.") by asking the V.E. hypothetical questions to establish whether someone with the same limitations as the claimant would be able to perform work in the national economy.  20 C.F.R. §§ 404.1520(g), 404.1560(c)

In the instant case, the ALJ determined that: (1) Plaintiff had not engaged in substantial gainful activity since December 26, 2005 the alleged onset date, (2) Plaintiff does have medically determinable impairments that substantially limit Plaintiffs ability to engage in basic work activities, but (3) Plaintiff does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in the 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12, 15). When reaching her step three determination, the ALJ, giving Plaintiff the benefit of the doubt, concluded that Plaintiff has moderate restrictions in activities of daily living, moderate restrictions in social functioning, and moderate restrictions in concentration, persistence or pace. (Tr. 15). The ALJ then indicated that, while she did not find these limitations to amount to a listed impairment under step three, she would include these limitations in reaching her RFC determination. (Tr. 16). Furthermore, the ALJ noted that the "mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories" used in the step 3 analysis. (*Id.*).

In reaching her RFC determination, the ALJ discredited Plaintiffs subjective testimony regarding her pain, mental impairments, and other symptoms due to the lack of objective evidence of a medically determinable condition(s) that could reasonable cause Plaintiff's alleged pain or other subjective symptoms. (Tr. 17). The ALJ also discredited the opinions of Dr. Grant and Ms. Clark on the grounds that their testimonies were inconsistent with the objective medical evidence or record and inconsistent with their own testimonies. (Tr. 17-20).

Based on her RFC determination, the ALJ concluded that Plaintiff was unable to perform any past relevant work. (Tr. 20). In the fifth and final step, the ALJ employed a V.E. to

determine whether jobs existed in significant numbers in the national economy that Plaintiff could perform give her age, education, work experience, and RFC. (Tr. 21). During the hearing, the ALJ poised four hypothetical questions before the V.E. First, the ALJ asked the V.E. whether a claimant with the residual functional capacity to stand and walk six hours in an eight-hour day, sit six hours in an eight-hour day, lift or carry 20 pounds occasionally and 10 pounds frequently, occasionally climb ladders, ropes and scaffolding, avoid concentrated exposure to extreme cold, avoid all exposure to unprotected heights, remember locations and work-like procedures, understand or remember and carry out short, simple instructions, maintain attention physically to complete simple one, two step tasks for a period of two hours without specific supervision or extra rest periods, occasionally have contact with the general public, occasionally have contact with coworkers and supervisors, and adapt to changes in the workplace would be able to perform any occupations. (Tr. 64).

Second, the ALJ asked whether someone with the same age, educational background, past relevant work experience, and RFC as the claimant in the first hypothetical but with the ability to frequently handle and finger bilaterally would be able to perform sufficiently demanded occupations in the national economy. (Tr. 66).

Third, the ALJ considered the same question but with a claimant who is limited to standing or walking two hours in an eight-hour day and lifting or carrying 10 pounds occasionally and less than 10 pounds frequently. (Tr. 67).

Finally, the ALJ asked the same question but with a claimant who has marked limitations in the ability to maintain attention and concentration for extended periods of time, a marked limitation in the ability to perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerance, a marked limitation in the ability to work in coordination with or within the proximity of other without being distracted by them, a marked limitation in the ability to complete a normal work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and a marked limitation in the ability to get along with peers without distracting them or exhibiting socially inappropriate behavior and to adhere to basis standards of neatness and cleanliness.  (Tr. 69).  The V.E. answered in the affirmative for all but the last hypothetical question.

### III.  Plaintiff's Arguments

Plaintiff raises three arguments for reversing or, at least, remanding the ALJ's decision. First, Plaintiff argues that the ALJ violated the treating physician rule by failing to give controlling weight to the two mental health specialists at the C.E.D. Medical Center, Dr. Grant and Ms. Clark.  (Pl.'s Mem. 15).  Because Dr. Grant was a treating physician who, according to his own reports, based his opinions on appropriate psychiatric medical findings, Plaintiff argues that his opinion should have been given controlling weight and the ALJ should have found Plaintiff disabled due to mental impairments.  (Pl.'s Mem. 17-18).  Similarly, Plaintiff argues that although Ms. Clark, as Plaintiff's therapist, is not an "accepted medical source" under the regulations, she ought to nonetheless be treated as a treating physician under the treating physician rule and, therefore, the ALJ's failure to accord her opinion controlling weight was reversible error.  (Pl.'s Mem. 19)

Second, Plaintiff argues that the ALJ failed to follow proper legal standards while evaluating Plaintiff's credibility regarding her symptoms.  (Pl.'s Mem. 20).  In support of this

argument, Plaintiff asks the court to evaluate the ALJ's determinations regarding all of Plaintiff's symptoms using the Eleventh Circuit's standard for evaluating subjective pain testimony. (*Id.*). Because the ALJ did not evaluate Plaintiff's non-pain-related symptoms using the pain standard, Plaintiff insists that the ALJ committed reversible error. (Pl.'s Mem. 24).

Finally, Plaintiff submits that the ALJ made two errors when using vocational expert testimony during step five of her analysis. The first error, Plaintiff asserts, is that the ALJ did not accurately assess Plaintiff's mental limitations when reaching her RFC determination because, as Plaintiff mentioned in her first argument, the ALJ failed to give controlling weight to the opinions of Dr. Grant and Ms. Clark. (Pl.'s Mem. 24-25). Because the ALJ relied upon the RFC determination when formulating hypothetical questions for the V.E., the ALJ's hypothetical questions are unsupported by substantial evidence because the RFC is unsupported by substantial evidence. (*Id.*). The second error, Plaintiff alleges, is that the ALJ did not accurately describe her (allegedly wrong) assessment of Plaintiff's mental limitations to the V.E. (Pl.'s Mem. 25). Plaintiff notes that when the ALJ considered whether Plaintiff's psychological limitations met a listing, she described Plaintiff's limitations broadly in terms of moderate limitations on daily activities, social functions, and concentration; however, the ALJ's hypothetical questions to the V.E. were specific and detailed. (*Id.*). Plaintiff submits that this discrepancy between the ALJ's findings at step three and her hypothetical questions at step five amounts to an impermissible failure to account for the limitations the ALJ found at step 3 as forbidden by *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th Cir. 2011). (*Id.*).

## IV.  Standard of Review

Judicial review of disability claims under the Act is limited to whether the Commissioner's decision is supported by substantial evidence or whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

Substantial evidence is more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see also Martin v. Sullivan*, 894 F.2d at 1529.   If supported by substantial evidence, the Commissioner's factual findings must be affirmed, even if the record preponderates against the Commissioner's findings.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); s*ee also Martin,* 894 F.2d at 1529.  Legal standards are reviewed *de novo*.  *Moore v. Barnhart*, 405 F. 3d 1208, 1211 (11th Cir. 2005).

## V.  Discussion

Plaintiff raises three arguments for reversing and remanding the ALJ's Decision: (1) the ALJ failed to follow the treating physician rule (Pl.'s Mem. at 14); (2) the ALJ failed to properly

evaluate Ms. Noah's credibility (Pl.'s Mem. at 20); and (3) the ALJ relied upon flawed vocational expert testimony when determining the availability of jobs in the national economy that Plaintiff could perform (Pl.'s Mem. at 24).  The court addresses each of these arguments in turn.

### A.      Substantial Evidence Supports the ALJ's Credibility Determinations Regarding Medical Evidence

Plaintiff first argues that the ALJ failed to follow the treating physician rule with regard to the opinions of the two mental health specialists from C.E.D., Dr. Grant and Ms. Clark.  With regard to Dr. Grant's opinion, Plaintiff points out that the regulations require the ALJ to give controlling weight to a treating physician's opinion regarding the nature and severity of a claimant's impairments "if [it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record." (Tr. 14) (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)).  Plaintiff then cites Dr. Grant's own statement that his opinions are "based on appropriate psychiatric medical findings" to support the conclusion that Dr. Grant's opinion is supported by medically acceptable clinical and diagnostic techniques, and therefore ought to be afforded controlling weight.  (Tr. 16-17).  This argument, however, misses one important step: the relevant medical opinion must not be inconsistent with other substantial evidence in the record.  A review of the record shows that, to the extent that the ALJ discredited the opinion of Dr. Grant, she correctly discredited testimony that was inconsistent with the objective evidence in the record.

Generally speaking, the weight afforded to a medical source's opinion regarding the nature and severity of a claimant's impairments depends on the medical source's relationship with the claimant, the evidence the medical source presents to support his opinion, and the

degree of consistency between the medical source's opinion with the medical evidence in the record as a whole. *See* 20 C.F.R. §§ 404.1527(c) and 416.927(c)(2). Under the "treating physician rule," a treating physician's opinion is entitled to substantial weight and an ALJ must articulate good reasons if she discredits the opinion of a treating physician. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). An ALJ may have good reason for discounting the opinion of a treating physician when, for example, the physician's opinion is unsupported by objective medical evidence or if the opinion is inconsistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c) and 416.927(c); *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159-60 (2004); 363 F.3d *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

Here, the record casts doubt as to whether Dr. Grant's findings are supported by objective medical evidence. The information collected in Dr. Grant's progress notes are almost entirely collected from Plaintiff's own subjective reports, which, the record shows, have not always been truthful. (*See* Tr. 237, 343, 357, 377, 378, 380, 530, 549). For example, Dr. Grant's progress notes all indicate that Plaintiff denied abusing drugs or alcohol. (Tr. 387, 606, 624, 637, 642, 644, 648, 650). However, Plaintiff tested positive for opiates, benzodiazepines, and alcohol around the time that she was receiving treatment at C.E.D. (Tr. 356).

Moreover, Dr. Grant's opinion is not only inconsistent with objective medical evidence; it is inconsistent with itself. Not all of the documents that bear Dr. Grant's signature appear to have been completed by him. (*Compare* Tr. 624, 648, 650 *with* Tr. 485, 571-78, 621). As a result, there are inconsistencies, for example, between Dr. Grant's progress notes - which describe Plaintiff as clean-dressed, mentally-coherent, and appropriately behaved (Tr. 624, 648, 650) - and other records describing Plaintiff as hostile and irritable (Tr. 572), suffering from

20

delusions and hallucinations (Tr. 572), and "totally disabled" (Tr. 485).  The ALJ's assessment that Dr. Grant's opinion is unsupported by objective evidence and inconsistent with itself is therefore supported by substantial evidence.

Plaintiff also contends that the ALJ violated the treating physician rule when she discredited the opinion of Ms. Clark.  While acknowledging that Ms. Clark, a therapist, is not an "acceptable medical source" and therefore "cannot be afforded controlling weight" under the regulations, Plaintiff insists that Ms. Clark's opinion should nonetheless be treated like the opinion of a treating physician for the purposes of the treating physician rule.  (Pl.'s Mem. 19).  In support of this proposition, Plaintiff notes that the regulations and rulings provide that non-acceptable medical sources, including evidence from a therapist, may also be considered by an ALJ.  (*Id.*) (citing 20 C.F.R. §§ 404.1513(d) and 416.913(d); SSR 06-03p).  Plaintiff suggests that if the court were to review the ALJ's treatment of Ms. Clark's opinion as if Ms. Clark were an "acceptable medical source," the court would find that the ALJ failed to give good reasons for rejecting Ms. Clark's opinion.  (Pl.'s Mem. 20).

This argument does not hold water.  An ALJ must provide good reasons for rejecting the opinion of a treating physician. *MacGregor,* 786 F.2d at 1053.  However, as Plaintiff concedes, Ms. Clark is not a treating physician; she is not even an acceptable medical source under the regulations.  The Social Security regulations limit acceptable medical sources to licensed (or certified) physicians, psychologists, optometrists, and podiatrists.  20 C.F.R. § 404.1513(a).  The regulations do indicate that, in addition to the acceptable medical sources, the ALJ *may* also use evidence from other sources, including therapists, to evaluate the severity of a claimant's impairment(s).  20 C.F.R. § 404.1513(d)(1).  However, the language of the regulations is

permissible; an ALJ *may* consider the opinions of a non-acceptable medical source, but is not obligated to treat such opinions in the same way that the ALJ would treat the opinions of an acceptable medical source, much less a treating physician.  Plaintiff's argument that the ALJ erred when she "failed to give good reasons for entirely rejecting Ms. Clark's opinions" assumes that the proper standard to apply here is the standard used to review an ALJ's evaluation of a treating physician's opinion.  It is not.

Plaintiff insists, nonetheless, that the observations of a therapist may be useful in evaluating the extent of a claimant's limitations.  There is no argument there; the Social Security Administration has already considered the probative value of evidence from non-acceptable medical sources and issued guidelines addressing how such evidence should be evaluated.  *See* Social Security Ruling 06-03p, 71 Fed. Reg. 45593, 45593 (Aug. 9, 2006).  Under the guidelines, information from a non-accepted medical source cannot be used to establish the existence of a medical impairment, but can be consulted to describe the nature and severity of the impairment based on the source's familiarity with the claimant.  71 Fed. Reg. at 45593.  The ALJ explicitly indicated that she evaluated Ms. Clark's opinions under the criteria set forth in Social Security Ruling 06-03p, and found them to be conclusory and unsupported by objective medical evidence.  (Tr. 18).  This finding is supported by substantial evidence.  Indeed, Ms. Clark's statement that Plaintiff is "totally disabled per psychiatrist's evaluation" is conclusory for at least two reasons.  (Tr. 598).  First, whether a claimant is disabled is a determination for the ALJ to make, not a therapist.  *See* 20 C.F.R. § 404.1527(e).  Second, and more importantly, Ms. Clark's statement is conclusory because it is unsupported by evidence.  In the psychological impairment questionnaire in which Ms. Clark declared Plaintiff to be totally disabled, there is a section that

asks the examiner to "[i]dentify the laboratory and diagnostic test results which demonstrate and/or support [the examiner's] diagnosis."  Ms. Clark wrote "NA."  (Tr. 599).[13]

**B.    Substantial Evidence Supports the ALJ's Decision to Discredit Plaintiff's Subjective Complaints of Pain**

Plaintiff next argues that "the ALJ failed to properly evaluate [Plaintiff's] credibility."  In support of this assertion, Plaintiff quotes *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991), the seminal case articulating the Eleventh Circuit's standard for evaluating subjective *pain* testimony, but replaces the word "pain" with the word "symptoms" and treats the standard as if it applies to evaluating any and all of a claimant's symptoms, not just subjective complaints of pain.  (Pl.'s Mem. 20) (misquoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Plaintiff then submits that under this revised standard, the ALJ applied the wrong legal standard in assessing her credibility[14] and that the ALJ's findings were insufficient to discredit Plaintiff.  (Pl.'s Mem. 21-22).  For the following reasons, this argument does not hold water.

The Eleventh Circuit has long established that a claimant seeking to show disabling pain must present (1) evidence of an underlying medical condition and (2) either objective medical evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Hand v. Heckler*, 761 F.2d at 1548 (quoting S.Rep. No. 466 at 24); *see also Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).  If the ALJ finds that a claimant meets this threshold requirement,

---

[13] A questionnaire signed by Dr. Grant but completed in Ms. Clark's handwriting clarifies that "labs/diagnostic testing [is] not done in this office."  (Tr. 572).

[14] At least, the court believes this to be the most reasonable interpretation of Plaintiff's argument; a typographical error apparently left only this fragment where Plaintiff's statement of her argument should have been: "[a]s an initial matter, the wrong legal standard in assessing Ms. Noah's credibility."  (Pl.'s Mem. 21).

the ALJ may still discredit a claimant's subjective allegations of disabling pain, but the ALJ "must clearly articulate explicit and adequate reasons for discrediting the claimant's allegations." *Dyer v Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *see also Holt*, 921 F.2d at 1223 (11th Cir. 1991), *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. *Holt*, 921 F.2d at 1223; *Cannon v. Bowen*, 858. F.2d 1541, 1545 (11th Cir. 1988).

Plaintiff focuses on the requirement that the ALJ give explicit and adequate reasons for discrediting a claimant's allegations of pain, but treats this as the standard for evaluating any and all representations made by a claimant regarding her symptoms. As an initial matter, the court should make clear that this argument mis-states the law.

Testimony regarding a claimant's own subjective allegations of pain is given special treatment in Social Security hearings. As a general matter, it may be viewed as something of a truism to say that a claimant's subjective testimony is worth little unless it is backed by objective evidence. However, the Social Security Administration recognizes that pain is a wholly subjective experience, and therefore a claimant's own description of her "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." Soc. Sec. R. 96-7p, 61 Fed. Reg. 34483, 34483 (July 2, 1996). As a result of the particular nature of pain, an evidentiary standard for subjective pain testimony that is too strict would deny benefits to meritorious claims, while a standard that is too low would allow non-meritorious claimants to prevail. Therefore, the pain standard, as promulgated by the Social Security Administration and interpreted by the Eleventh Circuit, seeks to balance these

competing concerns, allowing the ALJ to more accurately acknowledge the claimant's pain while still requiring an objective basis for determining the claimant's pain and other symptoms that raise similar evidentiary issues.[15]

The pain standard achieves this goal by effectively lowering a claimant's burden of proof by shifting it to the ALJ during the ALJ's RFC determination.  Generally, a claimant bears the burden of proving that she is disabled and that burden remains on the claimant until step four of the ALJ's five-step analysis.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  The pain standard shifts the burden to the ALJ during the ALJ's RFC determination.  The claimant must produce objective evidence of an underlying medically determinable physical or mental condition that confirms the severity of the alleged pain or could reasonably be expected to give rise to the alleged pain.  *Holt*, 921 F.2d at 1223.  Once the claimant has established objective evidence proving the existence of such a medical condition, the burden shifts to the ALJ to articulate explicit and adequate reasons for discrediting the claimant's testimony regarding the severity of her pain.  *Cannon*, 858. F.2d at 1545.  In her brief, Plaintiff describes this lower standard as if it were the universal standard for evaluating all symptoms alleged by Social Security claimants.  (Pl.'s Mem. 20).  The court finds no legal support for this interpretation and further notes that adopting it would eviscerate settled Social Security administrative procedures.

Moreover, even if Plaintiff's recitation of the law were correct (which it is not), Plaintiff fails to indicate which symptom(s) the ALJ improperly discredited.  (*See* Pl.'s Mem. 21-24).  At most, Plaintiff offers a single broad assertion that the ALJ failed to properly discredit her psychiatric limitations and a slightly more specific contention that the ALJ should have

---

[15] For a brief history of the development of the pain standard in the Eleventh Circuit, *see Elam v. Railroad Retirement Board*, 921 F.2d 1210, 1213-17 (11th Cir. 1991).

articulated explicit and adequate reasons for discrediting her testimony regarding her "symptoms, limitations, limited daily activities, and lack of significant improvement with treatment." (Pl.'s Mem. 22 - 24). This is not enough to show that the ALJ erred, even under the more generous pain standard, which requires that the claimant first establish objective evidence of an underlying medical condition *before* the burden shifts to the ALJ to articulate explicit and adequate reasons for discrediting such allegations. *Holt*, 921 F.2d at 1223.

As the ALJ notes, Plaintiff has failed to present any objective medical evidence establishing the existence of an underlying, medically-determinable condition that could account for the symptoms that Plaintiff alleges render her disabled. In fact, the objective medical evidence tends to point towards a lack of any underlying medically-determinable condition. Dr. Billian's MRI examination revealed Plaintiff's lumbar spine to be normal. (Tr. 233). Ultrasounds by Dr. Burch found a normal, functioning pelvic region. (Tr. 562-63). Dr. Billian's neurologic examinations failed to detect any problems. (Tr. 243, 238-39). Dr. Donadio's whole body bone scan showed overall normal bone structure and functioning. (Tr. 325). X-rays performed following Plaintiff's hospitalization for respiratory failure revealed that her lungs had cleared. (Tr. 518). Thus, the evidence in the record shows that Plaintiff has not established objective medical evidence of an underlying condition that could reasonably cause any of the disabling symptoms that Plaintiff alleges she suffers from.

With regard to daily living activities, Dr. Stehr found, based on Plaintiff's own statements, that Plaintiff is "100% independent" with regard to "all activities of daily living." (Tr. 378). Likewise, Plaintiff's allegation that there has been a lack of improvement with treatment also misses the mark. For example, Dr. Bently noted that the use of medication has

resulted in less frequent panic attacks and reduced Plaintiff's anxiety to the point where she was able to control her anxiety reasonably well unless she is in a large crowd. (Tr. 372). Similarly, Plaintiff herself stated that Neurontin helped "a lot" to alleviate her pain and that her pain returned when she stopped taking her medication. (Tr. 241-42).

To be clear, this court need not (and does not) reach any credibility determinations regarding Plaintiff's symptoms. Rather, the court has carefully examined the record and finds that the objective evidence in the record as a whole supports the ALJ's conclusion that Plaintiff has failed to establish the existence of objective medical evidence that would tend to support the symptoms Plaintiff claims to suffer. Plaintiff's second argument is therefore without merit.

### C.     The ALJ Submitted Proper Hypothetical Questions to the Vocational Expert

Plaintiff's final argument is that the ALJ's hypothetical questions to the Vocational Expert (the "V.E.") were inappropriate for two reasons: (1) they were based on an inaccurate RFC determination because the ALJ improperly discredited the opinions of Dr. Grant and Ms. Clark; and (2) the ALJ's hypothetical questions failed to incorporate her findings during step three of her determination, which is reversible error under *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th Cir. 2011). (Pl.'s Mem. 24-25).

Plaintiff's argument alleging that the RFC determination is wrong because the ALJ improperly discredited the opinions of Dr. Grant and Ms. Clark is simply a restatement of her first argument, which the court has already addressed. Plaintiff's second argument is more substantive.

When the ALJ seeks to determine whether the claimant is able to perform work during step five of the ALJ's analysis, the ALJ may ask a V.E. hypothetical questions to establish

whether someone with the same limitations as the claimant would be able to perform work in the national economy.  20 C.F.R. §§ 404.1520(g), 404.1560(c); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2011).  The ALJ's hypothetical questions must account for all relevant impairments, including the impairments the ALJ found in her RFC determination as well as impairments considered during step three of the five-step analysis to the extent that those impairments are not implicitly accounted for in the RFC determination.  *Winschel*, 631 F.3d at 1181.

In *Winschel*, the ALJ did not clearly indicate whether limitations identified when the ALJ examined the claimant's mental impairments using the Psychiatric Review Technique [16] ("PRT") during step three of the five-step analysis were incorporated into the ALJ's RFC assessment, which the claimant in that case argued made the ALJ's hypothetical questions to the V.E. incomplete.  631 F.3d at 1180.  The Eleventh Circuit held that the ALJ must explicitly indicate that the limitations found during step three of the ALJ's five step analysis do not affect a claimant's ability to work,[17] or otherwise implicitly account for the limitations in the hypothetical questions directed to the vocational expert.  *Id.* at 1181.  The failure to do so warrants remand.  *Id.*

---

[16] The Psychiatric Review Technique requires an ALJ to assess a claimant's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings (under 20 C.F.R. § 404, Subpart P, Appendix 1).  20 C.F.R. §§ 404.1520a and 416.920a.  Social Security guidlines indicate that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments.  Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34477 (July 02, 1996).

[17] What this duty requires beyond what is already imposed by the regulations is unclear; the RFC is, after all, an assessment of a claimant's residual functional capacity to engage in work despite the impairments established at step three of the ALJ's analysis.

The problem presented in *Winschel* does not exist here.  The ALJ explicitly indicated that the limitations identified during step three of her analysis would be included in her RFC assessment, from which she formulated her hypothetical questions to the vocational expert.  (Tr. 16).  Plaintiff's argument that the ALJ erred by providing a more detailed description of the limitations during steps four and five than during step three misses the mark.  As the ALJ correctly noted, the "mental residual functional capacity assessment used at step 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories" used in the step 3 analysis.  (*Id.*).  *See also* Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34477 (July 02, 1996) (indicating that "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the sections of the regulations used during step three of the analysis).  Plaintiff's third argument therefore fails.

## VI.  Conclusion

The court concludes that the ALJ's findings are supported by substantial evidence and the correct legal standards were applied. Therefore, the decision of the Commissioner is due to be affirmed.  A separate order will be entered.

**DONE** and **ORDERED** this _____20th_____ day of March, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE